FILED

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**

2013 JUN 27  P 1: 23

**Alexandria Division**

CLERK US DISTRICT COURT
ALEXANDRIA, VIRGINIA

KHADIJA LAAMIME,                    )
                                    )
                                    )
                                    )
        **Plaintiff,**              )
                                    )
                                    )       Case No. _1:13 cv 793_
**v.**                              )                 _CMH/JFA_
                                    )       **JURY TRIAL DEMANDED**
**SANAA ABOUZAID and AYMAN EL**     )
**TARABISHY,**                      )
                                    )
        **Defendants.**             )
_____)

## COMPLAINT

Plaintiff Khadija Laamime ("Ms. Laamime" or "Plaintiff"), by and for her Complaint in

the above-captioned matter, alleges as follows:

### PRELIMINARY STATEMENT

1.      Plaintiff Ms. Laamime was trafficked into the United States by Defendants Sanaa

Abouzaid ("Abouzaid") and Ayman El Tarabishy ("El Tarabishy") (collectively "Defendants")

for the purpose of providing forced labor at their residences in Arlington, Virginia. From

January until December 2011, Ms. Laamime was effectively imprisoned and forced to toil under

intolerable conditions – working at least 14 hours per day, 7 days a week – caring for twin

infants while cooking and cleaning for the entire household.

2.      For her services, Ms. Laamime was paid well less than required under U.S. federal law,

as well as less than promised within the written contract that had lured Ms. Laamime from

Morocco to the United States. Instead of the conditions guaranteed in her contract, she was

treated in an appalling and abusive fashion. Defendants, using coercive techniques often employed by human traffickers, isolated Ms. Laamime from the outside world and terrified her with the prospect of arrest, deportation, and a forced return to Morocco. They completely restricted Ms. Laamime's freedom of movement, forcing her to depend entirely upon them for her basic needs. They carried out this scheme through psychological coercion and manipulation, as well as physical intimidation and extreme verbal abuse.

3.      Most disturbing was Defendants' callous refusal to permit Ms. Laamime to seek necessary medical care. Ms. Laamime suffered from excruciating pain while employed by Defendants. After her escape from their home, Ms. Laamime's condition was diagnosed as stomach cancer.   In this way, Defendants isolated Ms. Laamime and ultimately abandoned her in her most needy hour – in contravention of her employment contracts, their duty to her as employers, and human decency.

4.      By these actions, Defendants violated Ms. Laamime's most basic human rights and acted in flagrant disregard of both federal and state law. Through this Complaint, Ms. Laamime seeks redress for these horrific events. Ms. Laamime brings this civil action under the Trafficking Victims Protection Reauthorization Act ("TVPRA"), the Fair Labor Standards Act ("FLSA"), state common law, and other provisions of federal and state law.

## JURISDICTION AND VENUE

5.      This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331. This Court has supplemental jurisdiction over Ms. Laamime's state law claims pursuant to 28 U.S.C. § 1367.

6.      This Court has personal jurisdiction over Defendants Abouzaid and El Tarabishy because, upon information and belief, each Defendant (i) resides in this judicial district, (ii)

regularly conducts business within this judicial district, and (iii) has committed the wrongful acts alleged in this Complaint within this judicial district.

7.       Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because both defendants reside in this district and a substantial part of the events or omissions giving rise to this claim occurred in this district.

8.       Assignment of this action to the Alexandria Division of this Court is appropriate pursuant to Local Rules 3(B)(1) and 3(C), as both defendants reside in the County of Arlington and a substantial part of the events or omissions giving rise to this claim occurred in the County of Arlington.

## PARTIES

9.       Plaintiff Ms. Khadija Laamime is a 33-year-old Moroccan national who resides in the United States. At the time of the events that give rise to this Complaint, Ms. Laamime was legally residing in the United States by virtue of a duly issued G-5 employment visa. Ms. Laamime resided with and worked for Defendants in two different homes in Arlington, Virginia, from January 20, 2011 to December 29, 2011.

10.      Upon information and belief, at all times relevant hereto, Defendant Abouzaid was a Moroccan national employed as a Corporate Governance Officer with the International Finance Corporation, a member of the World Bank Group in Washington, D.C.

11.      Upon information and belief, Abouzaid resided with her two children and husband, El Tarabishy, at an apartment in Arlington, VA, from on or about January 2011 to July 2011. From on or about July 2011 to the present, Abouzaid resided at a home in Arlington, VA, with her husband, El Tarabishy, and her two children.

3

12.     Upon information and belief, Defendant Abouzaid is present in the United States on a G-4 visa.

13.     Upon information and belief, at all times relevant hereto, Defendant El Tarabishy was a foreign national employed by the George Washington University and the International Council for Small Business in Washington, D.C.  Upon information and belief, El Tarabishy resided with his two children and wife, Defendant Abouzaid, at an apartment in Arlington, VA, from on or about January 2011 until July 2011.  From on or about July 2011 to the present, El Tarabishy resided at a home in Arlington, VA with his wife, Defendant Abouzaid, and his two children.

14.     Upon information and belief, Defendant El Tarabishy is present in the United States on a G-4 visa.

## FACTS ENTITLING MS. LAAMIME TO RELIEF

### *Inducement to Travel to the United States*

15.     Ms. Laamime was born in Morocco on January 1, 1980.  Prior to leaving for the United States in January 2011, she lived in a clay home with her parents and extended family in Sidi El Mokhtar, Chichaoua, Morocco.  With limited access to education during her childhood, Ms. Laamime was only able to obtain a first-grade education and limited reading and writing abilities.  Ms. Laamime only speaks Arabic.  During her employment with Defendants, Ms. Laamime could not read or speak English.

16.     Ms. Laamime was introduced to Defendant Abouzaid's mother in 2010.  This meeting was arranged by Ms. Laamime's sister, who became acquainted with Abouzaid's mother while working as a live-in housekeeper in Casablanca, Morocco.

17.     Upon information and belief, Defendant Abouzaid thereafter became pregnant with twin boys. Utilizing the help of family members acting as agents, Defendants then sought a live-in nanny and housekeeper from Morocco to join them in the United States.

18.     Upon information and belief, Defendant Abouzaid's mother recruited Ms. Laamime at Defendant Abouzaid's direction to come to the United States to serve as a caretaker for Abouzaid's twin boys.

19.     Upon information and belief, at the direction of Defendants Abouzaid and El Tarabishy, Abouzaid's mother induced Ms. Laamime to accept their offer of employment by promising Ms. Laamime that she would earn a fair salary, have the chance to learn English, and have access to a better life in America.

20.     Ms. Laamime, excited by the chance to establish a life for herself and provide for her ailing mother and family, accepted the position.

21.     Upon information and belief, at the direction of Defendants Abouzaid and El Tarabishy, Defendant Abouzaid's parents thereafter helped Ms. Laamime obtain her first Moroccan passport, and to apply for an entrance visa to the United States at the United States Consulate in Casablanca, Morocco. Defendant Abouzaid's parents paid all associated costs.

22.     In December 2010, Ms. Laamime was informed that her G-5 visa application was approved. Ms. Laamime was required to obtain a G-5 visa because Defendant Abouzaid holds a G-4 visa and, upon information and belief, works for the International Finance Corporation, a member of the World Bank Group. A G-4 visa is issued to foreign nationals serving within designated international organizations in the United States. G-4 visa holders can bring a personal employee to aid them in the United States, but must commit to paying this employee the U.S. State Department's Prevailing Wage, as well as that employee's travel expenses to and from

the United States. Such employees are issued G-5 visas after providing all required

documentation, submitting to a personal interview, and providing proof that they will receive a

fair wage comparable to that offered in the designated area of employment within the United

States.

23.     Ms. Laamime then traveled with Defendant Abouzaid's father to the United States

Consulate in Casablanca, Morocco, to arrange for her entry into the United States.

24.     Upon information and belief, once at the United States Consulate, Ms. Laamime was

presented with an employment contract (referred to hereafter as the "First Employment

Contract"), a true and correct copy of which is attached as Exhibit A. Ms. Laamime could not

read or understand the First Employment Contract because it was in English. As a result, a U.S.

Consulate translator informed Ms. Laamime of the terms of the First Employment Contract.

25.     The U.S. Consulate informed Ms. Laamime that the First Employment Contract promised

a rate of pay of $8.41 U.S. Dollars ("USD") per hour. *See* Ex. A at 2.. It also provided that Ms.

Laamime would only work from 10 a.m. to 4 p.m. on weekdays, and from 10 a.m. to 3 p.m. on

Saturdays, for a total of 35 hours per week. *See* Ex. A at 2. Ms. Laamime was not obligated to

work on Sundays. Further, the First Employment Contract provided that Ms. Laamime would

receive medical insurance, as well as paid holidays, sick days, and vacation days. *See id.* at 2-3.

26.     Defendant Abouzaid's mother had also previously promised Ms. Laamime that she would

be given the chance to learn English and would be given her own room in Defendants' home –

and generally promised that life would be better in America. Upon information and belief,

Defendant Abouzaid's mother made these promises at the direction of Abouzaid.

27.     Based upon the contents of the First Employment Contract and these representations and promises, Ms. Laamime signed the contract.  Ultimately, Defendant Abouzaid also signed the First Employment Contract as well.  Ex. A at 5.

28.     Upon information and belief, at no point did Defendants intend to abide by the contractual provisions of the First Employment Contract or the oral promises made to Ms. Laamime.

*Arrival In The United States*

29.     On January 20, 2011, Ms. Laamime traveled by airplane for the first time in her life.  She flew alone from Casablanca to John F. Kennedy Airport in New York.  Ms. Laamime met Defendant Abouzaid there, and then flew with her to Ronald Reagan Washington National Airport in Arlington, VA.

30.     On their flight together, Defendant Abouzaid told Ms. Laamime that she would be working for Abouzaid, and instructed Ms. Laamime that she was to do anything and everything she was told.  Further, Defendant Abouzaid instructed Ms. Laamime to never speak with Defendant El Tarabishy.  In exchange, Defendant Abouzaid reiterated that Ms. Laamime would be paid a good salary, would be allowed to learn English, and would travel with Defendants. Defendant Abouzaid also told Ms. Laamime that if these terms were not acceptable, she would send her right back to Morocco.

*Defendants Isolate and Subject Ms. Laamime to Forced Labor in the United States*

31.     Upon her arrival at Defendants' home in Arlington, Virginia, Ms. Laamime discovered that Defendants intended to violate numerous terms of the First Employment Contract.

32.     Ms. Laamime was told she would be living in the children's room, not her own room. Defendants provided Ms. Laamime an inflatable mattress on the floor upon which she was to

sleep. The only place for Ms. Laamime's personal effects was in her suitcase on the floor. After a few days, the inflatable mattress became inoperable, and Ms. Laamime was left sleeping on the floor. Eventually, Ms. Laamime was allowed to sleep on a futon in the room – but was forbidden from flattening it into a bed.

33.     Defendant Abouzaid forced Ms. Laamime to wear a long, buttoned robe and head scarf at all times. Abouzaid further ordered that Ms. Laamime was to keep her head covered at all times.

34.     Defendants controlled every aspect of Ms. Laamime's life. Although she had been told she would be primarily responsible for taking care of the twin infant boys, Ms. Laamime was required to attend to the entire family and the family's home.

35.     Instead of working five to six hours a day, six days a week, as she had been contractually promised, Ms. Laamime was forced to work from 7 a.m. until at least 9 p.m. – and typically later – seven days a week. Defendant Abouzaid demanded that Ms. Laamime serve as the sole caretaker for the twins. This left Ms. Laamime responsible for feeding, bathing, dressing, and playing with the twin infants every day, all day. In addition, Defendant Abouzaid demanded that Ms. Laamime clean all the bedrooms and bathrooms, the kitchen, and other living spaces in the home; prepare separate breakfasts and dinners for the infants and Defendants; wash dishes; do the family's laundry; and otherwise arrange and organize Defendants' home. In all instances, Defendant Abouzaid was extremely critical and demanding about the duties Ms. Laamime was forced to perform, and would frequently verbally abuse Ms. Laamime.

36.     When one of Defendants was travelling for work, however, Ms. Laamime was expected to be on call every hour of every day. On top of her typical duties, Ms. Laamime was expected to care for the twin infants all evening. To facilitate this, for instance, Ms. Laamime was required to sleep on a blanket on the floor in the same room as the twin infants when Defendant

El Tarabishy was out of town. In addition, when Defendant Abouzaid was out of town, Ms. Laamime was forced to sleep with baby monitors nearby to attend to the infants overnight.

37.     While Defendant Abouzaid was primarily responsible for meting out Ms. Laamime's tasks, Defendant El Tarabishy resided in the home during the entire employment period. Despite his awareness of his wife's extreme demands and abuse of Ms. Laamime, El Tarabishy did not take any affirmative steps to intercede on her behalf. Eventually, Ms. Laamime told Defendant El Tarabishy about the abuse, but he did nothing to remedy the situation despite having the authority to supervise and control Ms. Laamime's working conditions.

38.     The demands on Ms. Laamime became even more severe on or about July 2011, when Defendants moved into a much larger residence in Arlington, VA. Following that move, Ms. Laamime was forced to clean the entire home each day, as well as care for the twin infants. The babies, by then nearly eight months old, required around-the-clock attention and supervision.

39.     Ms. Laamime was forced to work every day, including Sundays, without respite. The First Employment Contract promised her afternoons, evenings and Sundays off, but Defendants did not honor these provisions. Indeed, on one occasion, Defendant Abouzaid even told Ms. Laamime that she would be working on Sundays, but would not be paid for her work. Moreover, Ms. Laamime was never given time off for vacation, sickness, or personal time while in the United States, with the exception of two hours on certain Sunday afternoons between late August 2011 and November 2011.

40.     All this work was done under the scrutiny of Defendants, who installed cameras in their home to observe and monitor Ms. Laamime. Ms. Laamime was then told that any missteps or failure to work would be caught on camera and result in deportation by the United States Government. To further instill fear within Ms. Laamime and force her to continue working at all

times, Defendant Abouzaid even led Ms. Laamime to believe that the sprinklers within the

family home also contained cameras, including those in the bathrooms. As a result, Ms.

Laamime felt uncomfortable changing her clothing anywhere in Defendant's home, as she

believed she was being recorded at all times.

41.     Defendant Abouzaid designed and implemented a scheme to isolate Ms. Laamime from

the outside world. In furtherance of this scheme, she forbade Ms. Laamime from making any

outside acquaintances or speaking to anyone else, especially individuals of Arab descent, while

in the United States. Further, she forbade Ms. Laamime from leaving the family home

unaccompanied, and refused to allow Ms. Laamime access to a house key until August 2011.

Even when allowed to access a house key for a few months, Ms. Laamime was not allowed to

leave unless her work was finished and Defendants were both home to watch the infants – which

rarely occurred, except for two hours on selected Sunday afternoons. Even then, Defendant

Abouzaid did not teach Ms. Laamime to use the local transportation systems or otherwise

introduce her to the neighborhood in which she lived. Indeed, Ms. Laamime did not even know

the exact address or zip code of Defendants' home – only that it was located in Virginia.

Defendant Abouzaid's actions effectively imprisoned Ms. Laamime within Defendants' home.

42.     In furtherance of this seclusion, Defendants did not teach Ms. Laamime how to use the

telephone to call her family in Morocco. Instead, Ms. Laamime was only allowed to call home

when Defendant Abouzaid permitted, at which time Defendant Abouzaid would dial the number

and remain close by. Ms. Laamime was never permitted to speak to her family freely, and she

was limited by Defendant Abouzaid to only speak with whomever answered the call. Defendant

Abouzaid also forbid Ms. Laamime from ever watching television, effectively insulating her

from any contact with the outside world and from her only opportunity to learn any English.

43.     When Defendants hosted guests, Ms. Laamime was ordered to prepare food and drinks, as well as cater to everyone's needs, for the duration of the guests' visit. Ms. Laamime was instructed to retreat to the kitchen after serving guests and to never speak with any guests. In particular, Defendant Abouzaid instructed Ms. Laamime not even to greet any Arabic-speaking guests. Defendant El Tarabishy was present for many of these guest visits and allowed Defendant Abouzaid's mistreatment of Ms. Laamime to continue unhindered.

44.     Upon information and belief, Defendant Abouzaid was required by her employer and the employment contracts to pay Ms. Laamime through official channels, such as a bank account solely in Ms. Laamime's name. Instead, Defendant Abouzaid created a joint account in her own name and Plaintiff's name, but frequently told Ms. Laamime that she had to reimburse Defendant Abouzaid for an unknown "amount" needed to open the account. Ms. Laamime could not read or write in English, was forbidden from leaving the home alone, and was not taught the value of U.S. currency. By design, therefore, she could not access the funds in the account without the supervision of Defendant Abouzaid. Ms. Laamime was entirely dependent upon Defendant Abouzaid to pay her the correct salary, as Ms. Laamime had no way of independently verifying that she was being paid correctly – or that she was repaying Defendant Abouzaid the correct amount used to initially open the account. Ms. Laamime was also dependent upon Defendant Abouzaid to take her to the bank to deposit or withdraw money from the joint account shared with Abouzaid.

45.     Further, Defendant Abouzaid understood that Ms. Laamime felt a tremendous responsibility to support her ill mother and family back in Morocco. Defendant Abouzaid exploited Ms. Laamime's resulting fear that her family would remain impoverished and manipulated Ms. Laamime's ability to send money home. Defendant Abouzaid only permitted

11

Ms. Laamime to send money to the family in Morocco via Defendant Abouzaid's mother, who served as a courier for the funds. Ms. Laamime was not permitted to send money to her family in Morocco through the bank or any official channels.

***Defendants Fail to Follow the Second Employment Contract***

46.     On October 28, 2011, Abouzaid prepared and executed a successor employment contract with Ms. Laamime (hereafter referred to as the "Second Employment Contract"), a true and correct copy of which is attached as Exhibit B. The Second Employment Contract indicated Ms. Laamime would work 35 hours per week: from 10 a.m. to 4 p.m. during the weekdays, and 10 a.m. to 3 p.m. on Saturdays. Ex. B at 2. The Second Employment Contract specified that Ms. Laamime was to earn $8.46 per hour, and was to receive paid time off for holidays, sickness, and vacation. *Id.* at 2. The Second Employment Contract further obligated Defendant Abouzaid to maintain health insurance coverage for Ms. Laamime. *Id.* at 3. It was written in English, which Ms. Laamime could not read or understand. The Second Employment Contract was signed by Defendant Abouzaid and, at her direction, by Ms. Laamime. *Id.* at 5.

47.     Despite this reaffirmation of Ms. Laamime's wages, benefits, and working conditions, Defendants' treatment of Ms. Laamime did not change, resulting in the violation of numerous terms of the Second Employment Contract.

48.     In sum, from January 20, 2011, to December 29, 2011, Ms. Laamime worked more than 400 hours per month. Despite this, she was only paid approximately $1,300 in gross wages per month. This equates to less than $3.00 per hour.

49.     To commemorate each payment, Ms. Laamime was given pay stubs written in English (which she could not understand) listing Defendants Abouzaid and El Tarabishy as her "employers."

50.    Ms. Laamime was never paid at all for her December 2011 work for Defendants.

*Defendants' Threats and Mistreatment of Ms. Laamime*

51.    Defendant Abouzaid frequently insulted and berated Ms. Laamime throughout the

employment period. Defendant Abouzaid would often slam her hands on tables and counters in

disgust during these tirades, and then brag that while other employers might give Ms. Laamime a

beating, she would not do so. Defendant Abouzaid even told Ms. Laamime that no one would

care if Ms. Laamime were to suffer a beating at Defendant Abouzaid's hands. These tactics

served to intimidate and scare Ms. Laamime, forcing her to continue working non-stop in the

hope that she could ward off further verbal assaults and potential physical harm from Defendant

Abouzaid.

52.    Defendant Abouzaid's tirades were often followed by threats to forcefully send Ms.

Laamime back to Morocco. In this way, Defendant Abouzaid made Ms. Laamime fear that if

she failed to obey Abouzaid's every command, she would be sent back to Morocco – either at the

hands of U.S. immigration authorities or by Defendants.

53.    Ms. Laamime initially feared a return to Morocco because she would be perceived a

failure if returned, and would be unable to provide financial support for her family. Later, Ms.

Laamime came to fear that she could not survive the trip back due to her then-undiagnosed

illness. Defendant Abouzaid was aware of these conditions, and used Ms. Laamime's fears to

coerce her continued employment.

54.    Defendant Abouzaid would also threaten Ms. Laamime by saying that if she allowed

anything to happen to the children, "the police will come and take you."

55.    Additionally, when Ms. Laamime tried to speak in Defendant Abouzaid's presence, she

was berated and denigrated, *e.g.*: "You don't know a thing;" "You don't know how to speak the

English language;" "If you don't like things, I can send you back and find a 'Filipina' girl to replace you."

56.    Defendant Abouzaid's frequent outbursts and apparent emotional instability, coupled with her inability or unwillingness to care for her twin infants, led Ms. Laamime to fear for the children's safety should she should be returned to Morocco. Defendant Abouzaid used Ms. Laamime's strong concern for the well-being of the infants to coerce Ms. Laamime into continuing her employment. Knowing Ms. Laamime was very attached to the children, Defendant Abouzaid would frequently yell at Ms. Laamime and then tell her that she must endure such abuse because the children needed her. Fearing for the children's safety and well-being, and fearing that another caretaker would treat the twin infants like Defendant Abouzaid treated her, Ms. Laamime continued working.

57.    Defendant Abouzaid's repeated threats and aggressive outbursts led Ms. Laamime to suffer severe emotional distress, rendering her traumatized to the point of fearing every word uttered in Defendant Abouzaid's presence. As a result, she largely stopped speaking in the presence of Defendant Abouzaid altogether, and lived in constant terror.

58.    Defendants did not honor their promise to help Ms. Laamime learn English. Instead, after a few months of employment, Defendant Abouzaid finally told Ms. Laamime that she could take English classes in her seventh month of employment. When the seventh month of employment came, Defendant Abouzaid then told Ms. Laamime she could take English classes in her ninth month of employment. When the ninth month of employment came, Defendant Abouzaid told Ms. Laamime that she could not take classes because they were in the evening, and if Ms. Laamime left Defendants' home, there would be no one to do her work – despite the fact that Ms. Laamime was contractually entitled to stop working at 4 p.m. on weeknights.

Further, Defendant Abouzaid stated that her husband, El Tarabishy, did not approve of Ms. Laamime taking English classes.

### Defendants' Refusal to Provide Ms. Laamime with Medical Care

59.    Soon after arriving in the United States, Ms. Laamime began to experience debilitating stomach pains on an increasing frequency.

60.    As time passed in 2011, these pains became increasingly worse, leading to a decreased appetite and frequent vomiting, as well as significant weight loss. All of these symptoms were readily observable by Defendants, with whom Ms. Laamime lived and interacted on a daily basis. Indeed, Defendant Abouzaid was present at times when Ms. Laamime would weigh herself, and would state it was "not her business" to care if Ms. Laamime's weight decreased. These alarming symptoms led Ms. Laamime to beg Defendants to help her obtain medical care.

61.    However, despite knowing Ms. Laamime was solely reliant upon them for medical care and assistance, and that they were contractually obligated to facilitate such medical care, Defendants did not help her. Indeed, Defendant Abouzaid refused to take Ms. Laamime for medical treatment in the United States, instead telling her that she (Abouzaid) did "not need this headache." Defendant Abouzaid then told Ms. Laamime to go back to work, and to stop complaining or mentioning the need for a doctor.

62.    Defendant Abouzaid further told Ms. Laamime that obtaining medical care in the United States was very expensive and not worthwhile, as American doctors would not give Ms. Laamime any medication to help her. Defendant Abouzaid deliberately led Ms. Laamime to fear the cost of obtaining medical treatment in the United States, and to fear the incompetence of United States medical professionals, with the intent that Ms. Laamime would no longer request to see a doctor.

63.     In December 2011, the pain and symptoms became so unbearable that Ms. Laamime was rendered nearly incapacitated. She informed Defendant Abouzaid and Abouzaid's sister, who was visiting at the time, that she felt she was going to die. Instead of seeking medical assistance, however, Defendant Abouzaid and her sister cruelly dismissed and mocked Ms. Laamime, telling her that if she died, they would find her in the morning, dead.

64.     Additionally, Defendant El Tarabishy, despite being able to readily observe Ms. Laamime's weight loss and physical symptoms, took no apparent action to help Ms. Laamime receive medical care of any kind.

### Ms. Laamime's Escape From Defendants

65.     In late November 2011, Defendant Abouzaid forced Ms. Laamime to return the set of house keys to which she was given access in August 2011. Believing she was entitled to take at least an afternoon walk, however, Ms. Laamime thereafter convinced Defendant El Tarabishy to allow her access to a set of keys over the course of two days while Defendant Abouzaid was away on a business trip. Using these keys, Ms. Laamime went for a brief afternoon walk on two consecutive days, though she became ill and had to quickly return home on the second day.

66.     Once Defendant Abouzaid returned home, she discovered Ms. Laamime had obtained a set of keys and had spoken with El Tarabishy. Defendant Abouzaid became enraged and began to aggressively question Ms. Laamime. Defendant Abouzaid chastised Ms. Laamime for going outside when she was forbidden from leaving the home and for speaking with El Tarabishy. Defendant Abouzaid then told Ms. Laamime that she would be sent to Morocco if she could not follow directions, and would be replaced with a "Filipina girl."

67.    Ms. Laamime then asked Abouzaid for a copy of her employment paperwork, a request that Abouzaid refused. One day later, however, Defendant Abouzaid inexplicably threw Ms. Laamime's employment paperwork at her and stormed away.

68.    Over the course of the following week, Defendant Abouzaid and her sister, who was visiting at the time, frequently screamed and yelled at Ms. Laamime, shaming and embarrassing her. Both women threatened to send Ms. Laamime to Morocco if she could not follow instructions, and repeatedly told her she was not wanted in Defendants' home and should leave. Further, Defendant Abouzaid began repeatedly demanding that Ms. Laamime re-do her completed housework in an effort to torment her.

69.    During this time, in an effort to terrify Ms. Laamime into nonetheless continuing her employment, Defendant Abouzaid's sister told Ms. Laamime that any attempt to escape would lead to the police arresting her, tying her hands and legs, and disfiguring her.

70.    Frightened, Ms. Laamime went to Defendant El Tarabishy and told him of Defendant Abouzaid's abusive behavior and threats. Defendant El Tarabishy indicated to Ms. Laamime that he would speak with his wife, but ultimately no changes occurred to improve Ms. Laamime's living or working conditions.

71.    Thereafter, Ms. Laamime was told by Defendant Abouzaid to either get on a flight to Morocco or simply leave Defendants' home. Sick, weak, frightened and severely distressed, Ms. Laamime packed her suitcase and dragged it out the front door into the December cold. She was in severe pain, spoke no English, had been provided no airplane ticket, did not know how to access her bank account, had made no acquaintances during her time in the United States, and had no idea where to go. She wandered into a nearby mall, where she fortuitously came across a

Moroccan man and woman who helped her call a trafficking hotline and arranged for her transportation to a nearby homeless shelter.

72.     After her escape, Ms. Laamime was able to obtain medical care through the aid of a local homeless shelter.  After multiple emergency room visits for her increasingly debilitating pain, she was diagnosed with an aggressive form of stomach cancer.  The disease, which was quite advanced by the time Ms. Laamime received medical care, required immediate surgery, followed by months of intense radiation and chemotherapy.

73.     As a result of this treatment, Ms. Laamime suffered extreme pain as well as physical, emotional, and mental anguish.  Ms. Laamime was frequently unable to eat, subjecting her to severe weight loss.  At times she was so weak she could not speak.  Ms. Laamime continues to require frequent follow-up care, which has added to the already-significant expenses she has incurred in battling her illness.

74.     Indeed, Ms. Laamime has incurred well in excess of $14,000 in outstanding medical bills and continues to incur further medical expenses daily, which she has no means to repay.

75.     Ms. Laamime continues to suffer from Defendants' unspeakable mistreatment and struggles to recover from the debilitating physical and emotional trauma inflicted on her.

## FIRST CLAIM FOR RELIEF

### Involuntary Servitude
### Pursuant to the Thirteenth Amendment to the U.S. Constitution and
### 18 U.S.C. §§ 1584, 1595
### (Against Both Defendants)

76.     Ms. Laamime realleges and incorporates by reference, as if set forth fully herein, each and every allegation contained within the preceding paragraphs.

77.     Ms. Laamime brings this claim for relief under the private cause of action implied under the Thirteenth Amendment to the United States Constitution, and under 18 U.S.C. § 1584, which

prohibit involuntary servitude. Plaintiff is permitted to bring a civil cause of action under 18 U.S.C. § 1595.

78.     As alleged herein, Defendants Abouzaid and El Tarabishy used mental, physical, and legal coercion, along with outrageous threats, to carry out a scheme, plan or pattern that intentionally and successfully induced Ms. Laamime to work against her will and without the legally required amount of pay.

79.     Using this coercion, Defendants Abouzaid and El Tarabishy knowingly and willfully held Ms. Laamime in involuntary servitude, forcing her to work up to fourteen or more hours each day, to tend to their family's every need.

80.     Ms. Laamime was highly vulnerable and susceptible to Defendants' threats and coercion. Defendants' high social status and education level as compared to Ms. Laamime, who has only a first-grade education, exacerbated this vulnerability.

81.     In furtherance of their scheme, Defendants took control of Ms. Laamime's employment contracts, and purposefully directed her to sign these, and other, documents written in a foreign language that Ms. Laamime did not understand.

82.     Moreover, Ms. Laamime was purposefully prevented from associating with anyone outside the home, rendering her isolated and utterly dependent upon Defendants by design.

83.     Defendants knowingly, willfully, and maliciously denied Ms. Laamime necessary medical care, allowing her later-diagnosed stomach cancer to progress without treatment for months during the employment period.

84.     Through such actions, Defendants knowingly and willfully directed, assisted, conspired, and acted in concert with each other to create and enforce a system of involuntary servitude prohibited by the Thirteenth Amendment to the United States Constitution and 18 U.S.C. § 1584.

85.     In doing so, Defendants knowingly and willfully carried out a scheme, plan or pattern intended to cause Ms. Laamime to believe that if she did not continue in her employment, she would suffer both serious mental harm and the abuse or threatened abuse of the legal process via United States authorities deporting her from the country.

86.     Defendant El Tarabishy knowingly benefitted from participation in this venture in the form of free labor and completion of needed chores and childcare, even though he knew or should have known the venture engaged in amounted to involuntary servitude in violation of chapter 18 of the United States Code.

87.     Defendants committed the acts alleged herein maliciously, fraudulently, and oppressively, with a criminal indifference to civil obligations, and with the wrongful intent of injuring Ms. Laamime.  Defendants committed these tortious acts in conscious disregard of Ms. Laamime's rights.

88.     As a direct and proximate result of these actions, Ms. Laamime has sustained damages, including severe emotional distress, economic losses, and severe physical injury.

89.     Plaintiff is therefore entitled to recover damages in an amount to be proven at trial, including punitive damages and attorneys' fees.

## SECOND CLAIM FOR RELIEF

**Trafficking with Respect to Peonage, Slavery, Involuntary Servitude, or
Forced Labor in Violation of the Trafficking Victims Protection Act of 2000,
18 U.S.C. §§ 1590, 1595
(Against Both Defendants)**

90.     Ms. Laamime realleges and incorporates by reference, as if set forth fully herein, each and every allegation contained within the preceding paragraphs.

91.     By inducing Ms. Laamime to accept employment with them in the United States, transporting Ms. Laamime to the United States, and, upon arrival, harboring her in their home,

all through fraud and deception and for the purposes of subjecting her to involuntary servitude, forced labor, and enslavement, Defendants engaged in trafficking of Ms. Laamime in violation of 18 U.S.C. § 1590. Plaintiff is permitted to bring a civil cause of action under 18 U.S.C. § 1595.

92.     Defendant El Tarabishy knowingly benefitted from participation in this venture in the form of free labor and completion of needed chores and childcare, even though he knew or should have known the venture engaged in amounted to trafficking in violation of chapter 18 of the United States Code.

93.     Defendants committed the acts alleged herein maliciously, fraudulently, and oppressively, with a criminal indifference to civil obligations, and with the wrongful intent of injuring Ms. Laamime. Defendants committed these tortious acts in conscious disregard of Ms. Laamime's rights.

94.     As a direct and proximate result of Defendants' actions, Ms. Laamime has sustained damages, including severe physical injury, severe emotional distress, and economic losses.

95.     Plaintiff is therefore entitled to recover damages in an amount to be proven at trial, including punitive damages and attorneys' fees.

### THIRD CLAIM FOR RELIEF

**Forced Labor Violation of the Trafficking Victims Protection Act of 2000,
18 U.S.C. §§ 1589, 1595
(Against Both Defendants)**

96.     Ms. Laamime realleges and incorporates by reference, as if set forth fully herein, each and every allegation contained within the preceding paragraphs.

97.     Defendants knowingly obtained Ms. Laamime's labor and services by means of serious harm, psychological coercion, threatened abuse of legal processes, and a scheme, plan or pattern of behavior intended to cause Ms. Laamime to believe that, if she did not perform such labor or

services, she and/or Defendants' children would suffer serious harm. By these actions, Defendants violated the forced labor provisions of the Trafficking Victims Protection Act, 18 U.S.C. § 1589. Ms. Laamime brings these claims pursuant to the civil cause of action for victims of forced labor embodied within 18 U.S.C. § 1595.

98.     Defendant El Tarabishy knowingly benefitted from participation in this venture in the form of free labor and completion of needed chores and childcare, even though he knew or should have known the venture engaged in constituted forced labor in violation of chapter 18 of the United States Code.

99.     Defendants committed the acts alleged herein maliciously, fraudulently, and oppressively, with a criminal indifference to civil obligations, and with the wrongful intent of injuring Ms. Laamime. Defendants committed these tortious acts in conscious disregard of Ms. Laamime's rights.

100.    As a direct and proximate result of Defendants' actions, Ms. Laamime has sustained damages, including severe physical injury, economic loss, and severe emotional distress.

101.    Plaintiff is therefore entitled to recover damages in an amount to be proven at trial, including punitive damages and attorneys' fees.

## FOURTH CLAIM FOR RELIEF

### Federal Minimum Wage
### (Against Both Defendants)

102.    Ms. Laamime realleges and incorporates by reference, as if set forth fully herein, each and every allegation contained within the preceding paragraphs.

103.    Defendants employed Ms. Laamime within the meaning of the Fair Labor Standards Act, 29 U.S.C. §§ 203(d)-(e) ("FLSA"). In the alternative, at the very least Defendant Abouzaid

served as Ms. Laamime's primary employer, and Defendant El Tarabishy qualified as a joint employer under the FLSA.

104. In all periods of Ms. Laamime's employment, Defendants willfully and in bad faith failed to pay Ms. Laamime's statutory minimum wages, in violation of 29 U.S.C. §§ 206(b), (f), and regulations of the United States Department of Labor.

105. At all times relevant hereto, the relationship between Defendants and Ms. Laamime was one of private master and servant.

106. Defendants' willful violation of the FLSA entitles Ms. Laamime to recover her unpaid minimum wages and an equal amount as liquidated damages, and reasonable attorneys' fees and costs of the action pursuant to 29 U.S.C. §§ 201 *et seq.* and United States Department of Labor regulations.

## FIFTH CLAIM FOR RELIEF

### Unjust Enrichment
### (Against Both Defendants)

107. Ms. Laamime realleges and incorporates by reference, as if set forth fully herein, each and every allegation contained within the preceding paragraphs.

108. Ms. Laamime rendered services as a live-in domestic servant to Defendants in good faith, and with the expectation that she would be fairly compensated for such services.

109. Defendants accepted these services knowing Ms. Laamime expected to be fairly compensated for these services and, in turn, failed to compensate Ms. Laamime for the fair market value of her services.

110. As a result, Defendants have been unjustly enriched at Ms. Laamime's expense.

111. At all times relevant hereto, the relationship between Defendants and Ms. Laamime was one of private master and servant.

112.  Plaintiff is therefore entitled to recover damages in an amount to be proven at trial, including liquidated damages and attorneys' fees.

## SIXTH CLAIM FOR RELIEF

### Negligence
### (Against Both Defendants)

113.  Ms. Laamime realleges and incorporates by reference, as if set forth fully herein, each and every allegation contained within the preceding paragraphs.

114.  Defendants owed a duty to Ms. Laamime as her employers and as de facto guardians because she was, by design of Defendants, fully dependent upon them in the United States. Unfamiliar with U.S. customs and institutions, and with no English skills or understanding of how to access her bank account or even the value of the U.S. Dollar, Ms. Laamime fully relied on Defendants for access to medical care, shelter, food, and transportation. And, because Ms. Laamime arrived in the United States by G-5 visa, her immigration status was entirely dependent upon Defendants.

115.  Defendants assumed a duty to help Ms. Laamime obtain medical care by contracting to provide her with medical insurance in exchange for her services.

116.  Defendants' duty to Ms. Laamime included the provision of prompt medical care when necessary.

117.  Defendants breached their duty when they willfully, maliciously, and callously disregarded Ms. Laamime's increasing pleas for medical care during the onset and existence of debilitating stomach pains associated with stomach cancer throughout her employment.

118.  As a direct and proximate result of this breach, Ms. Laamime suffered severe emotional distress, psychological harm, and physical injury.

119.    Further, Defendants' negligence rose to the level of conscious and deliberate disregard for the interests of others such that their conduct may be called willful or wanton, and such that their conduct has the character of outrage frequently associated with criminal conduct.

120.    Plaintiff is therefore entitled to damages in an amount to be established at trial, including punitive damages.

## SEVENTH CLAIM FOR RELIEF

### False Imprisonment
### (Against Both Defendants)

121.    Ms. Laamime realleges and incorporates by reference, as if set forth fully herein, each and every allegation contained within the preceding paragraphs.

122.    Through Defendants' willful and deliberate scheme, Ms. Laamime was intentionally confined to Defendants' home without her consent or other legal justification. Defendant Abouzaid deliberately withheld a house key from Ms. Laamime to prevent her from coming and going freely, forbade Ms. Laamime from speaking to anyone outside the family, and forbade Ms. Laamime from making any acquaintances while in the United States. Defendant El Tarabishy was party to these actions, and never objected or otherwise attempted to release Ms. Laamime other than briefly allowing her access to a house key.

123.    Upon learning of this proffer of the house key, Defendant Abouzaid immediately demanded return of the key, thereby sentencing Ms. Laamime to further imprisonment and confinement within Defendants' home until her escape later in December 2011.

124.    Defendants' actions were undertaken with the purpose and effect of ensuring Ms. Laamime would feel isolated and removed from the outside world, deepening her seclusion and preventing her from alerting law enforcement authorities to her unlawful involuntary servitude and forced labor.

125. As a direct result of Defendants' actions, Ms. Laamime feared leaving Defendants' home.

126. Upon information and belief, Defendants acted with a conscious and deliberate disregard for the interests of others such that their conduct may be called willful and wanton, and such that it has the character of outrage frequently associated with criminal conduct.

127. As a direct and proximate result, Ms. Laamime has suffered physical, emotional, and economic damages.

128. Plaintiff is therefore entitled to recover these damages in an amount to be proven at trial, as well as punitive damages and attorneys' fees.

## EIGHTH CLAIM FOR RELIEF

### Negligent Infliction of Emotional Distress
### (Against Both Defendants)

129. Ms. Laamime realleges and incorporates by reference, as if set forth fully herein, each and every allegation contained within the preceding paragraphs.

130. Defendants negligently engaged in outrageous conduct toward Ms. Laamime, causing her to suffer severe emotional distress and physical harm.

131. Defendants owed a duty to Ms. Laamime as employers and de facto guardians because she was utterly dependent upon them in the United States. Unfamiliar with U.S. customs and institutions and without the ability to read, speak or write English, Ms. Laamime relied upon Defendants for access to medical care, shelter, and food. In addition, because Ms. Laamime arrived in the United States on a G-5 employment visa, her immigration status was entirely dependent upon her employers. It was foreseeable that this dependence – coupled with Ms. Laamime's extensive work schedule, isolation from the outside world, and Defendant Abouzaid's verbal abuse and threats – would cause Ms. Laamime to suffer severe emotional distress.

132.    Defendants breached this duty by failing to obtain medical care for Ms. Laamime, as well as by failing to attend to her basic needs throughout her employment period.

133.    As a proximate result of Defendants' conduct, Ms. Laamime suffered and will continue to suffer extreme emotional distress.

134.    Further, Defendants' callous disregard of Ms. Laamime's onsetting stomach cancer caused Ms. Laamime to unnecessarily bear the extraordinary physical pain associated with the untreated, undiagnosed progression over months of such illness without medical care of any kind.

135.    Plaintiff is therefore entitled to recover damages in an amount to be proven at trial, including attorneys' fees.

## NINTH CLAIM FOR RELIEF

### Breach of Contract I
### (Against Defendant Abouzaid)

136.    Ms. Laamime realleges and incorporates by reference, as if set forth fully herein, each and every allegation contained within the preceding paragraphs.

137.    Ms. Laamime and Defendant Abouzaid executed a valid, binding employment agreement (the First Employment Contract) on or about December 21, 2010, whereby Ms. Laamime agreed to work for Defendants as a nanny and housekeeper and Abouzaid agreed to pay Ms. Laamime the U.S. State Department Prevailing Wage, which was $8.41 per hour, for a 35-hour work week. Abouzaid also contracted to provide Ms. Laamime with paid days off for holidays, vacation, and illness. Abouzaid further contracted to provide overtime pay of $8.41 per hour for all hours in excess of 40 hours per week. Abouzaid also contracted to provide medical insurance at no cost to Ms. Laamime.

138. Defendant Abouzaid intentionally and willfully failed and refused to pay Ms. Laamime the wages promised in the First Employment Contract. Ms. Laamime was never given a full day off of work by Defendants while in the United States, and was forced by Defendants to work far in excess of the contractual 35-hour work week. Moreover, Ms. Laamime was never paid by Defendants for any hours worked beyond the first 35 hours of each week, despite having worked approximately 103 hours per week.

139. Defendant Abouzaid also intentionally and willfully failed to secure medical care for Ms. Laamime during the course of her employment, even in the face of increasing evidence that Ms. Laamime was grievously ill.

140. Defendant Abouzaid's refusal to pay Ms. Laamime the promised contractual wages and provide the conditions and benefits promised within the First Employment Contract was enacted with conscious and deliberate disregard for the interests of others such that Abouzaid's conduct may be called willful or wanton, and such that her conduct has the character of outrage frequently associated with criminal conduct.

141. At all times relevant hereto, the relationship between Defendant Abouzaid and Ms. Laamime was one of private master and servant.

142. As a direct and proximate result of Defendant Abouzaid's failure to pay Ms. Laamime her contractual wages or obtain medical care, Ms. Laamime suffered economic losses, psychological harm and physical injury.

143. As a result, Plaintiff is entitled to recover damages in an amount to be proven at trial, including attorneys' fees.

## TENTH CLAIM FOR RELIEF

### Breach of the Covenant of Good Faith and Fair Dealing I
### (Against Defendant Abouzaid)

144.    Ms. Laamime realleges and incorporates by reference, as if set forth fully herein, each and every allegation contained within the preceding paragraphs.

145.    Ms. Laamime and Defendant Abouzaid executed a valid, binding employment agreement on or about December 21, 2010 (the First Employment Contract), whereby Ms. Laamime agreed to work for Defendants as a nanny and housekeeper and Abouzaid agreed to pay Ms. Laamime the U.S. State Department Prevailing Wage, which was $8.41 per hour, for a 35-hour work week. Abouzaid also contracted to provide Ms. Laamime with paid days off for holidays, vacation, and illness. Abouzaid further contracted to provide overtime pay of $8.41 per hour for all hours in excess of 40 hours per week. Abouzaid also contracted to provide medical insurance at no cost to Ms. Laamime.

146.    Ms. Laamime performed all, or substantially all, of her obligations under the First Employment Contract.

147.    All conditions for Defendant Abouzaid's performance were satisfied or excused.

148.    Nonetheless, Defendant Abouzaid unfairly and without justification interfered with Ms. Laamime's right to receive benefits under the First Employment Contract. Ms. Abouzaid purposefully paid Ms. Laamime far below the rate required under the First Employment Contract, and refused to allow or help Ms. Laamime to use health insurance of any kind. Ms. Abouzaid therefore unfairly frustrated Ms. Laamime's efforts to obtain the benefit of their bargain.

149.    As a direct and proximate result of Defendant Abouzaid's conduct, Plaintiff suffered economic losses, psychological harm, and physical injury.

150.    As a result, Plaintiff is entitled to recover damages in an amount to be proven at trial, including attorneys' fees.

## ELEVENTH CLAIM FOR RELIEF

### Breach of Contract II
### (Against Defendant Abouzaid)

151.    Ms. Laamime realleges and incorporates by reference, as if set forth fully herein, each and every allegation contained within the preceding paragraphs.

152.    Ms. Laamime and Defendant Abouzaid executed a valid, binding employment agreement on or about October 28, 2011 (the Second Employment Contract), whereby Ms. Laamime agreed to work for Defendants as a nanny and housekeeper and Abouzaid agreed to pay Ms. Laamime the U.S. State Department Prevailing Wage, which was $8.46 per hour, for a 35-hour workweek. Abouzaid also contracted to provide Ms. Laamime with paid days off for holidays, vacation, and illness. Abouzaid further contracted to provide overtime pay of $8.46 per hour for all hours in excess of 40 hours per week. Abouzaid also contracted to provide medical insurance at no cost to Ms. Laamime.

153.    Defendant Abouzaid intentionally and willfully failed and refused to pay Ms. Laamime the wages promised in the Second Employment Contract. Ms. Laamime was never given a full day off of work by Defendants while in the United States, and was forced by Defendants to work well more than the contractual 35-hour work week. Moreover, Ms. Laamime was never paid by Defendants for any hours worked beyond the first 35 hours of each week, despite having worked approximately 103 hours per week. Further, Ms. Laamime was never paid any wages at all for the month of December 2011.

154.   Defendant Abouzaid also intentionally and willfully failed to secure medical care for Ms. Laamime during the course of her employment, even in the face of increasing evidence that Ms. Laamime was grievously ill.

155.   Defendant Abouzaid's refusal to pay Ms. Laamime the promised contractual wages and provide the conditions and benefits promised within the Second Employment Contract was enacted with conscious and deliberate disregard for the interests of others such that Abouzaid's conduct may be called willful or wanton and such that her conduct has the character of outrage frequently associated with criminal conduct.

156.   At all times relevant hereto, the relationship between Defendants and Ms. Laamime was one of private master and servant.

157.   As a direct and proximate result of Defendant Abouzaid's failure to pay Ms. Laamime her contractual wages or obtain medical care, Ms. Laamime suffered economic losses, psychological harm and physical injury.

158.   As a result, Plaintiff is entitled to recover damages in an amount to be proven at trial, including attorneys' fees.

## TWELFTH CLAIM FOR RELIEF

### Breach of the Covenant of Good Faith and Fair Dealing II
### (Against Defendant Abouzaid)

159.   Ms. Laamime realleges and incorporates by reference, as if set forth fully herein, each and every allegation contained within the preceding paragraphs.

160.   Ms. Laamime and Defendant Abouzaid executed a valid, binding employment agreement on or about October 28, 2011 (the Second Employment Contract), whereby Ms. Laamime agreed to work for Defendants as a nanny and housekeeper and Abouzaid agreed to pay Ms. Laamime the U.S. State Department Prevailing Wage, which was $8.46 per hour, for a 35-hour work week.

Abouzaid also contracted to provide Ms. Laamime with paid days off for holidays, vacation, and illness. Abouzaid further contracted to provide overtime pay of $8.46 per hour for all hours in excess of 40 hours per week. Abouzaid also contracted to provide medical insurance at no cost to Ms. Laamime.

161. Ms. Laamime performed all, or substantially all, of her obligations under the Second Employment Contract.

162. All conditions for Defendant Abouzaid's performance were satisfied or excused.

163. Nonetheless, Defendant Abouzaid unfairly and without justification interfered with Ms. Laamime's right to receive benefits under the Second Employment Contract. Ms. Abouzaid purposefully paid Ms. Laamime far less than that which was required under the Second Employment Contract, and refused to allow or help Ms. Laamime use health insurance of any kind. Ms. Abouzaid therefore unfairly frustrated Ms. Laamime's efforts to obtain the benefit of their bargain.

164. As a direct and proximate result of Defendant Abouzaid's conduct, Plaintiff suffered economic losses, psychological harm, and physical injury.

165. As a result, Plaintiff is entitled to recover damages in an amount to be proven at trial, including attorneys' fees.

## THIRTEENTH CLAIM FOR RELIEF

### Intentional Infliction of Emotional Distress
### (Against Defendant Abouzaid)

166. Ms. Laamime realleges and incorporates by reference, as if set forth fully herein, each and every allegation contained within the preceding paragraphs.

167.   On a daily basis throughout Ms. Laamime's employment, Defendant Abouzaid used her position of power and control over Ms. Laamime to engage in an intentional and reckless pattern of outrageous verbal abuse and aggression against her.

168.   Aware of Ms. Laamime's isolation and distress, Defendant Abouzaid repeatedly, outrageously, and intentionally prevented her from forming acquaintances or interacting with other individuals, thereby deepening her suffering.  In furtherance of this scheme, Abouzaid effectively imprisoned Ms. Laamime by surveilling her every move and threatening her with deportation for any misstep, as well as by forbidding her from accessing a house key -- rendering Ms. Laamime unable to freely come and go from the home, and in a constant state of discomfort while in the home.

169.   As a proximate result of Defendant Abouzaid's intentional and outrageous conduct, Ms. Laamime has suffered and will continue to suffer extreme and severe emotional distress, humiliation, and mental anguish.

170.   Further, Defendant Abouzaid acted with conscious and deliberate disregard for the interests of others such that her conduct may be called willful and wanton, and such that it has the character of outrage frequently associated with criminal conduct.

171.   Indeed, Defendant Abouzaid's actions are so outrageous, so extreme in degree, as to exceed all possible bounds of decency and instead be regarded as atrocious and utterly intolerable in a civilized community.

172.   Plaintiff is therefore entitled to recover damages in an amount to be proven at trial, including punitive damages and attorneys' fees.

## FOURTEENTH CLAIM FOR RELIEF

### Fraudulent Inducement
### (Against Defendant Abouzaid)

173.   Ms. Laamime realleges and incorporates by reference, as if set forth fully herein, each
and every allegation contained within the preceding paragraphs.

174.   Upon information and belief, Defendant Abouzaid intentionally and knowingly
misrepresented to Ms. Laamime the conditions of her employment and conditions in the United
States in order to induce her to come to the United States, under the pretense that, *inter alia*, Ms.
Laamime would be afforded a reasonable work schedule and reasonable working conditions.
Additionally, Defendant Abouzaid represented that Ms. Laamime would be allowed to enroll in
English classes during her employment.

175.   Upon information and belief, Defendant Abouzaid made the above representations, which
were conveyed through her parents acting as her agents, with the intention that Ms. Laamime
would rely upon them in order to entice her to come to the United States and force her to work in
Defendants' household.

176.   Ms. Laamime did in fact rely upon Defendant Abouzaid's misrepresentations to her
detriment and, as a result, Ms. Laamime was forced to work as a domestic servant for
Defendants where she was denied the chance to have reasonable working conditions and hours,
or enroll in English classes.

177.   Upon information and belief, Defendant Abouzaid never intended to follow through, and
did not follow through, on her promises to Ms. Laamime.  Defendant Abouzaid did not intend to
and did not allow Ms. Laamime to attend any English classes, and did not plan to or actually give
her any full days off from work while in the United States; did not plan to and did not take care
of her medical and social needs; and, in sum, did not offer her reasonable working conditions or

hours. Instead, Abouzaid forced Ms. Laamime to work extreme hours, seven days a week, for her benefit and that of her husband and children.

178.    Upon information and belief, at the time Defendant Abouzaid made the foregoing representations and promises, she had no intention of meeting those representations and promises.

179.    Upon information and belief, Abouzaid made the foregoing representations with a conscious and deliberate disregard for the interests of others such that her conduct may be called willful and wanton, and such that it has the character of outrage frequently associated with criminal conduct.

180.    As a direct and proximate result of these actions, Ms. Laamime relied upon these misrepresentations which has directly led to severe economic, emotional, and physical harm to Ms. Laamime.

181.    Plaintiff is therefore entitled to recover damages in an amount to be proven at trial, as well as punitive damages and attorneys' fees.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff based on the foregoing allegations, respectfully prays for judgment against Defendants as follows:

(a)    Monetary damages for each Claim for Relief;

(b)    Punitive and exemplary damages according to proof;

(c)    Attorneys' fees and costs for the Plaintiff against Defendants; and

(d)    Such other further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff respectfully demands a trial by jury on all claims for relief so triable.

**Dated:** June 27, 2013

Respectfully Submitted,

Mary D. Hallerman (VSB #80430)
James G. Rizzo (*pro hac vice application pending*)
Emre N. Ilter (*pro hac vice application pending*)
McDermott Will & Emery LLP
500 North Capitol Street, N.W.
Washington, DC 20001
Telephone:  202-756-8000
Fax: 202-756-8087
Email: mhallerman@mwe.com
Email: jrizzo@mwe.com
Email: eilter@mwe.com

*Attorneys for Plaintiff*